UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD B. FAGAN,                         )
                                          )
                    Plaintiff             )
                                          )
          v.                              )          Civil Action No. 11-30184-MAP
                                          )
MASS MUTUAL LIFE INVESTORS'               )
SERVICES, INC., MASS MUTUAL               )
FINANCIAL GROUP, BRANDY                   )
ALEXANDER, SERGIO FLORES,                 )
ERIN TOBIN, and DOE DEFENDANTS            )
YET UNNAMED,                              )
                                          )
                    Defendants            )

REPORT AND RECOMMENDATION WITH REGARD TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Document No.45)
May 24, 2013

NEIMAN, U.S.M.J.

Richard B. Fagan ("Plaintiff"), proceeding *pro se*, brought this action in state court

asserting a myriad of claims arising out of his employment and eventual termination at

MassMutual Life Investors' Services, Inc. ("MMLISI").  In addition to MMLISI, Plaintiff

named as defendants MassMutual Financial Group, Brandy Alexander, Sergio Flores,

Erin Tobin, and "Doe Defendants yet unnamed."  On June 30, 2011, pursuant to 28

U.S.C. § 1441, Defendants removed the action to this court because it raised a federal

question.

Although Plaintiff purports to assert eighty separate causes of action, his claims

substantially overlap.  In essence, Plaintiff appears to assert claims for age

discrimination, retaliation in connection with his request for unpaid wages, retaliation for

pursuing a customer complaint regarding alleged unlawful conduct on the part of

MMLISI, defamation, violation of the covenant of good faith and fair dealing, hostile

work environment, conspiracy, "negligent supervision," and "negligent management."

Defendants presently seek summary judgment on all of Plaintiff's claims.  The

motion has been referred to this court for a report and recommendation.  *See* 28 U.S.C.

§ 636(b)(1)(B).  For the following reasons, the court will recommend that Defendants'

motion be allowed.

## I.  STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the

facts in a light most favorable to the non-moving party.  *Benoit v. Tech. Mfg. Corp.*, 331

F.3d 166, 173 (1st Cir. 2003).  Summary judgment is appropriate when "there is no

genuine issue as to any material fact" and "the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" when the evidence is such

that a reasonable fact-finder could resolve the point in favor of the non-moving party,

and a fact is "material" when it might affect the outcome of the suit under the applicable

law.  *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994).  The non-moving party

bears the burden of placing at least one material fact into dispute after the moving party

shows the absence of any disputed material fact.  *Mendes v. Medtronic, Inc.*, 18 F.3d

13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Although evidence submitted by *pro se* litigants should be construed liberally, *see*

*Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988), "*pro se* status

does not free a litigant in a civil case of the obligation to comply with procedural rules,"

*Ruiz Rivera v. Riley*, 209 F.3d 24, 28 n.2 (1st Cir. 2000).

2

## II. B<small>ACKGROUND</small>

The following facts have been deemed undisputed by the court and are construed in a light most favorable to Plaintiff.  Although Plaintiff does assert at various times that he "disputes" Defendants' articulation of the facts, far more often than not he fails to support his version with citations to the record, in sharp contrast to Defendants. *See* Local Rule 56.1 ("A party opposing the motion [for summary judgment] shall include a concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried, *with page references to affidavits, depositions and other documentation*." (emphasis added)).  Rather than cataloging each of Plaintiff's unsupported "disputes" of material fact, the court has considered Defendants' assertions of fact undisputed when Plaintiff fails to support his contrary assertions with evidence.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").  Still, the court has reviewed all of the documents attached to Plaintiff's opposition memorandum and has incorporated undisputed facts contained therein when appropriate.

This was not an easy task, however.  By way of example only, Plaintiff, in his opposition, included citations to a number of exhibits that were not attached and were found nowhere else in the record.  Moreover, due to Plaintiff's failure to comply with Local Rule 56.1, the court was forced to expend a disproportionate amount of its limited resources on this case.  *See Fedex Customer Information Services, Inc. v. Fright Catalog*, 2010 WL 3505162, at *1 (D.Mass. Aug. 27, 2010) ("The purpose of provisions

such as Rule 56.1 is to ensure that the parties focus the Court's attention on what is genuinely controverted and to prevent them from 'unfairly shifting the burdens of litigation to the court,' by, for example, leaving the 'court to grope unaided by factual needles in a documentary haystack.'" (quoting *Hernandez v. Philip Moris USA, Inc.*, 486 F.3d 1, 7-8 (1st Cir. 2007))).  That said, the facts follow.

Plaintiff began working at MMLISI in the call center as a Rep Services Representative ("Rep") on or around May 15, 2006.  (Defendants' Statement of Undisputed Material Facts ("Defs' SOF") ¶ 1.)  MMLISI is a wholly-owned subsidiary of Massachusetts Mutual Life Insurance Company ("MassMutual"); MassMutual Financial Group, in turn, is a fleet name for MassMutual and its subsidiaries.  (Id. ¶ 3.)  Plaintiff was only employed by MMLISI and not by its parent company, MassMutual, and he was at all times an at-will employee.  (Id. ¶ 2.)

Over the course of Plaintiff's employment, the procedures utilized at the call center changed substantially.  (Id. ¶ 8-20.)  For example, in the Fall of 2006, the call center went "paperless"; in April of 2007, MMLISI announced that all Reps had to obtain a Series 7 certification, *i.e.*, a basic securities license required for investment brokers, within approximately one year; beginning in the Fall of 2007, Reps could no longer request assistance from other departments but were instead required to research caller questions using a computer program known as "Quest"; and, at some point, Reps were required to utilize new department specialists for certain issues.  (Id. ¶ 9-14.)  In addition, while Plaintiff was always required to obtain certain identifying information from callers as a security measure, these security protocols became more important over time.  (Id. ¶¶ 7, 19.)

The ways in which MMLISI evaluated Reps changed significantly during this period as well, including increases in the number of criteria used for evaluations and the establishment of minimum targets for "metrics" used to evaluate calls.  (Id. ¶15-16.) These metrics included Quality (which measured the accuracy of information provided by the Rep to the caller and the quality of customer service during a call), Adherence (which measured how closely the Rep followed his or her computerized schedule), ACW/Call Tracking (which measured how timely and accurately the Rep recorded a call in computerized notes), and AHT (which measured the average length of calls).  (Id. ¶ 17.)  Reps were required to track 100% of calls, achieve an Adherence score of at least 90% and a Quality score of at least 2.55.  (Id. ¶ 18.)

Plaintiff had some difficulty adjusting to these changes and, as a result, Erin Tobin, Plaintiff's supervisor at the time, sent him an email on December 4, 2007, explaining that his performance was lacking in several areas.  (Id. ¶ 26.)  In particular, Tobin explained that (a) Plaintiff had tracked only 77%, 74%, and 78% of calls for the months of September, October, and November of 2007, respectively, rather than 100% as required; (b) Plaintiff's Adherence scores were below the 90% requirement; (c) two of Plaintiff's calls in the month of November received Quality scores below 2.55; and (d) a customer had complained about Plaintiff's tone of voice and willingness to help.  (Id. ¶ 27; Exhibit D (attached to Defs' SOF).)  Tobin reiterated these problems in Plaintiff's 2007 year-end Performance Evaluation, in which she rated Plaintiff's overall performance as "Needs Improvement," the lowest rating possible, and explained that he continued having problems with tracking calls, Adherence, Quality, and transitioning from pen and paper to the computerized note-taking system.  (Defs' SOF ¶ 29; Exhibit F

(attached to Defs' SOF).)

In January of 2008, Plaintiff passed the Series 7 exam.  (Exhibit A (attached to Defs' SOF) at 23.)  As a result, on February 19, 2008, Tobin requested that Plaintiff receive an increase to his base salary effective as of the date he passed the exam. (Exhibit 14 (attached to Plaintiff's Response to Defendants' Statement of Undisputed Facts ("Pl's SOF"))); Exhibit P (attached to Defs' SOF).)  For unknown reasons, however, Plaintiff did not receive this salary increase.  (Exhibit P (attached to Defs' SOF).)  Moreover, Plaintiff did not receive overtime pay for time he spent attending preparation classes in September of 2007, even though other MMLISI employees who attended the same classes did receive overtime.  (Id.)

On April 3, 2008, Tobin issued Plaintiff a Performance Warning.  (Defs' SOF ¶ 31; Exhibit G (attached to Defs' SOF).)  Tobin first explained that, while Plaintiff's adherence and tracking frequency had improved, she had "not seen a sustained improvement in tracking timeliness, quality, and behavior."  (Exhibit G (attached to Defs' SOF).)  She then discussed Plaintiff's "loud tone and unprofessional comments" during various meetings, at which Plaintiff received performance evaluations and compensation statements, and admonished that "[t]his behavior is not acceptable and must stop immediately."  (Id.)  She also raised concerns about a particular phone call during which Plaintiff offered "incorrect advice" and transferred the caller to a supervisor contrary to established procedure.  (Id.)  In addition, she stated that Plaintiff's notes regarding the call "were vague and the call was not tracked until 45 minutes after the initial call was taken because you took another call before you completed tracking on this one," despite being required to "track every call immediately after you take the call."

6

(Id.)  Finally, Tobin explained that Plaintiff was expected to improve his performance and behavior immediately and that "[f]ailure to improve will result in further disciplinary action up to and including potential termination."  (Id.)

Plaintiff's performance improved during 2008, as reflected in his mid-year and year-end Performance Evaluations, but he continued to struggle in certain areas.  (Defs' SOF ¶ 36.)  For example, Tobin noted in Plaintiff's mid-year Performance Evaluation that "[a]t times he still struggles in tracking, hold procedures, anticipating future needs and confidence" and that he "continues to manually track calls on paper which is increasing his ACW and tech support time."  (Exhibit H (attached to Defs' SOF).)  In Plaintiff's year-end Performance Evaluation, Sam Toskin -- who took over for Tobin as Plaintiff's supervisor in July of 2008 (Exhibit A (attached to Defs' SOF) at 151-52) -- noted that he "is still not complying with departmental policy as it relates to AWD tracking and has at times made inaccurate or missing entries."  (Exhibit I (attached to Defs' SOF).)  However, both evaluations also indicated that Plaintiff's Adherence scores were excellent and that, among other things, he was doing a better job of handling constructive feedback.  (Exhibit H (attached to Defs' SOF); Exhibit I (attached to Defs' SOF).)  Accordingly, both Tobin and Toskin rated Plaintiff's overall performance as "Building Consistency," which is one step higher than the "Needs Improvement" rating he received in his 2007 year-end Performance Evaluation.  (Id.)

On October 29, 2008, Plaintiff sent an email to three individuals regarding a call he received from a Mr. E.V.  (Exhibit 39a (attached to Pl's Exhibit 39a).)  In the email, Plaintiff explained that Mr. E.V. was attempting to establish an estate account "since September with no luck due to rep licensing and paperwork issues."  (Id.)  "At this

point," Plaintiff continued, "we need to get a rep who is licensed as soon as possible since the client is worried about the large loss in account value since this was first initiated." (Id.)  Plaintiff forwarded the email to Toskin the following day.  (Exhibit 39 (attached to Pl's Exhibit 39.)  Plaintiff later testified during his deposition that, despite his proper escalation of Mr. E.V.'s issue within MMLISI, it was not handled appropriately and, as a result, Mr. E.V. "ended up losing $350,000 [and] filed a complaint with the company."  (Exhibit A (attached to Defs' SOF) at 201-203.)

Following his 2008 year-end Performance Evaluation, Toskin arranged for Plaintiff to receive individualized training so as to improve his technical skills, including, most importantly, "wean[ing] away" from using pen and paper and, instead, typing call notes directly into the computer.  (Defs' SOF ¶ 39; Exhibit A (attached to Defs' SOF) at 85-87, 176-77.)  In an email he sent to Plaintiff arranging for these trainings, Toskin explained, "[s]hould these deficiencies persist beyond the February training period, we may have to resort to a more formal written performance management plan."  (Exhibit J (attached to Defs' SOF).)  In any event, during the first week of February of 2009, Plaintiff received the scheduled training and, following each session, his trainers provided management with detailed emails documenting the areas covered, observations regarding his performance, and recommendations going forward.  (Defs' SOF ¶ 40; Exhibit K (attached to Defs' SOF).)  Around this same time, Sergio Flores replaced Toskin as Plaintiff's supervisor.  (Defs' SOF ¶ 42.)

On February 24, 2009, Flores sent an email to Kathleen Mayko, a Human Resource Consultant, inquiring about the salary increase and overtime payments that Plaintiff never received in connection with his Series 7 certification.  (Exhibit P (attached

to Defs' SOF).)  Flores explained that Plaintiff informed him of these issues "during our one on one this month."  (Id.)  Over the next few weeks, Flores also corresponded with Tobin and others at MMLISI to determine why Plaintiff never received this compensation and the amount he was owed.  (Id.)  Tobin, for her part, responded with shock that Plaintiff had not received the pay increase she had requested approximately one year earlier.  (Id.)  Finally, on March 11, 2009, after much correspondence and investigation, Flores obtained approval for Plaintiff to receive a retroactive pay raise and overtime payments to be paid "either in his next pay check or the following paycheck on March 26th (whichever is administratively possible)."  (Id.; Defs' SOF ¶ 53.)

In the meantime, on March 2, 2009, Flores placed Plaintiff on Performance Probation for ninety days for failing to sufficiently improve his performance following the February training sessions and for violating MMLISI's security measures during a call. (Id. ¶ 44, 46; Exhibit L (attached to Defs' SOF).)  In a memorandum to Plaintiff, Flores first summarized the February training sessions and discussed the Performance Warning which Tobin issued him on April 3, 2008.  (Exhibit L (attached to Defs' SOF).) Flores then explained, "[w]hile you have shown some improvements in tracking, your metrics and quality have not improved since the additional training was provided."  (Id.) Next, Flores discussed a particular call during which Plaintiff failed to "verify the name and registration of the account" or "confirm the last four digits of the Rep ID with the caller to ensure privacy and security of our client," which, Flores explained, constituted "a major violation of call center procedures."  (Id.)  Finally, Flores informed Plaintiff that he was "expected to improve [his] performance to a satisfactory level" and that "[f]ailure to maintain satisfactory performance during or after the Probation can result in

immediate termination." (Id.)

On March 16, 2009, Plaintiff received a Quality score of 1.27 on a call for failing to track it. (Defs' SOF ¶ 28; Exhibit M (attached to Defs' SOF).) On March 20, 2009, after receiving word of Plaintiff's score, which was well below the minimum requirement of 2.55 and, thus, a violation of his probation, Flores' supervisor, Thomas Frances, reached out to the Human Resources Director, Anne-Marie Szmyt, to inquire whether they could "move ahead" with Plaintiff's termination. (Exhibit O (attached to Defs' SOF).) Also on March 20, 2009, Jimmy Warren, who worked in the Compliance Department, informed Plaintiff that Mr. E.V. had filed a complaint about MMLISI in which, despite criticizing everyone else, he praised Plaintiff for helping him. (Exhibit A (attached to Defs' SOF) at 207.) Plaintiff responded by asking Warren to "tell my boss." (Id.) On March 24, 2009, Flores terminated Plaintiff's employment. (Defs' SOF ¶ 52.) In his final paycheck, Plaintiff received, in addition to his regular wages, $5,128.52 in retroactive pay for the overtime and salary increase related to his Series 7 certification.[1] (Id. ¶ 54; Exhibit Q (attached to Defs' SOF).)

### III. DISCUSSION

A. Age Discrimination Claims

In the absence of direct evidence of discrimination, both Massachusetts and federal age discrimination claims are governed by the three-step *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-

---

[1] To the extent Plaintiff claims that he did not receive all of the wages to which he was entitled, he has not provided any evidence to support this assertion. Moreover, he admitted during his deposition that he received the back wages he was seeking. (Exhibit A (attached to Defs' SOF).)

805 (1973); *Wheelock Coll. v. Massachusetts Com'n Against Discrimination*, 355 N.E.2d

309, 313-14 (Mass. 1976).  First, a plaintiff must demonstrate a *prima facie* case of age

discrimination.  To do this under the ADEA, the plaintiff must show (1) he was over forty

years old at the time of the adverse action; (2) he was subjected to such an action, for

example, termination; (3) he was performing his job at a level that met the employer's

legitimate expectations; and (4) following his termination, he was replaced by someone

substantially younger.  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308,

310, 313 (1996); *Melendez v. Autogerman, Inc.*, 622 F.3d 46, 50 & n.5 (1st Cir. 2010).

Under Massachusetts law, in addition to the ADEA requirements, a plaintiff must

demonstrate that he was replaced by someone who was at least five years younger

than him.  *Knight v. Avon Products, Inc.*, 780 N.E.2d 1255, 1264-65 (Mass. 2003).  If the

plaintiff can satisfy this initial burden, the burden of production shifts to the defendant

employer to articulate a legitimate, nondiscriminatory reason for its actions.  *McDonnell*

*Douglas Corps*, 411 U.S. at 802; *Wheelock College*, 355 N.E.2d at 313-14.  If the

defendant meets that burden, the burden of production shifts back to the plaintiff to

demonstrate that the defendant's articulated reason was pretextual.  *Id.*  While the

burden of production shifts back and forth, the "ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all

times with the plaintiff."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

143 (2000).

        Here, there is no direct evidence of age discrimination.  To be sure, Plaintiff

contends throughout his opposition to Defendants' motion that there are various

examples of such "direct evidence" in the record.  He is mistaken.  "'[D]irect evidence'

11

refers to a 'smoking gun' showing that the decision-maker *relied upon* a protected characteristic in taking an employment action." *PowerComm, LLC v. Holyoke Gas & Elec. Dep't*, 657 F.3d 31, 35 (1st Cir. 2011).  Plaintiff, however, has presented no direct evidence that indicates that MMLISI or any of his supervisors relied upon his age in taking any employment action.  Accordingly, the three-step burden-shifting framework applies.

As an initial matter, Defendants assert that Plaintiff cannot meet his burden of making out a *prima facie* case of age discrimination and that, even if he can overcome that initial burden, he cannot show that MMLISI's legitimate, nondiscriminatory reason for the termination was pretextual.  Plaintiff responds that he has met his *prima facie* burden and, in addition, that the record contains sufficient evidence from which a jury could find that the articulated reason for his termination was pretextual.  Defendants, in the court's view, have the far better argument.

For present purposes, the court will assume that Plaintiff can meet his *prima facie* burden, even though it is less than clear from the record.  *See LeBlanc v. Great American Inc. Co.*, 6 F.3d 836, 844 (1st Cir. 1993) ("'[T]he burden of making out a prima facie case is not onerous.'") (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991)).  As for the second *McDonnell Douglas* step, Plaintiff concedes that Defendants have articulated a legitimate, nondiscriminatory reason for his termination, namely, his continuing performance problems.  Accordingly, the court will move to the third *McDonnell Douglas* step and address the parties' arguments regarding pretext.

The court pauses to note, however, that, while the Massachusetts and federal age discrimination standards are generally analogous, they depart somewhat at this

step.  Under federal law, as the First Circuit has explained, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Melendez*, 622 F.3d at 52 (internal quotation marks omitted).  Under Massachusetts law, in contrast, a plaintiff need only demonstrate "that one or more of the employer's reasons is false," which showing, "combined with the evidence adduced to meet the employee's burden of proof under the first stage of *McDonnell Douglas*," permits (but does not require) the jury to "infer that the employer is covering up a discriminatory intent, motive or state of mind.  *Lipchitz v. Raytheon Co.*, 751 N.E.2d 360, 368 (Mass. 2001).  Thus, under the "friendlier" *Lipchitz* standard, a mere showing of pretext, "automatically and regardless of circumstances," is sufficient to defeat a motion for summary judgment.  *See Joyal v. Hasbro, Inc.*, 380 F.3d 14, 17 (1st Cir. 2004).

Here, the court concludes that Plaintiff has not carried his burden at this step under either the federal or state standard.  Simply stated, Plaintiff has not produced any evidence from which a reasonable jury could conclude that Defendants' articulated reason for terminating his employment was false or that they were motivated by unlawful age animus.  A close reading of Plaintiff's prolix complaint and convoluted memorandum reveals that he is more concerned with disputing the reasonableness of his termination than demonstrating that the articulated rationale was a pretext.

In this regard, it is important to remember that "[c]ourts may not sit as super personnel departments, assessing the merits -- or even the rationality -- of the employers' nondiscriminatory decisions."  *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74

(1st Cir. 2004) (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)).  Thus, the question here is not whether Defendants made a faulty business decision but, rather, whether they genuinely believed the nondiscriminatory reason provided for the decision.  *See Joyal v. Hasbro, Inc.*, 380 F.3d 14, 19 (1st Cir. 2004) ("'[I]f the reason given by the employer is the real reason for its action,' it does not matter if 'the employer's action was arbitrary or unwise.'") (quoting *Wheelock Coll.*, 355 N.E.2d at 315)).

While Plaintiff quibbles with Defendants' assertions that his performance was lacking and points instead to other evidence purportedly showing that his performance was actually "good to excellent," this evidence does little, if anything, to support his claim of pretext.  It is hardly surprising that, in addition to the evidence of deficient performance, there is also evidence that Plaintiff performed some of his work duties well.  Nor is it surprising that Plaintiff disagrees with the techniques of the evaluations used to demonstrate that his performance was inadequate and instead blames others for various shortcomings.  In the end, however, what Plaintiff fails to do is proffer any evidence demonstrating that Defendants did not believe that his performance was inadequate.  *See Bennett v. Saint-Gobain Corp.*, 453 F.Supp.2d 314, 327 (D.Mass. 2006) ("[T]he inquiry is not whether the plaintiff's version of events is true, but whether the decision-maker reasonably believed that the plaintiff had engaged in misconduct.") (citing *Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-P.R.*, 404 F.3d 42, 45 (1st Cir. 2005)).  Contrary to Plaintiff's assertions, the court sees nothing nefarious which would permit a jury to find pretext.

To be sure, Plaintiff argues at various times that older employees in the MMLISI

14

call center were treated harsher than younger employees.  In particular, he claims that, at one point, all of the older workers (except him) were terminated for failing to obtain their Series 7 certification, while younger workers who also failed were not fired.  As Defendants argue, however, Plaintiff proffers no evidence whatsoever which supports these claims.  Accordingly, the court will not consider Plaintiff's naked charges of disparate treatment of older workers.  *See* Fed. R. Civ. P. 56(e)(2).

Persevering, Plaintiff also points to the following as raising inferences of pretext: a lack of investigation into his termination from various supervisors, a lack of documentary evidence showing that Defendants followed termination policies, Flores' lack of knowledge of employment laws during his deposition, and the fact that he received "more exacting scrutiny" than his co-workers.  Much to Plaintiff's dismay no doubt, the court has determined that none of this "evidence," whether standing alone or considered in context, supports his assertion of pretext.

As to the "exacting scrutiny" argument, Plaintiff cites an exhibit containing the heading "Action Plan -- Richard Fagan" in which Flores explained that he met with Plaintiff on January 1, 2009, "to discuss his performance and to lay out an action plan to improve his skills as a service center representative."  (Exhibit 22 (attached to Pl's SOF).)  Flores described the purpose of Plaintiff's specialized training scheduled for the beginning of February, namely, "to give him the opportunity to eliminate any deficiencies that exist between his initial and subsequent training on these systems."  (Id.)  Flores then noted that he would like to see Plaintiff's performance improve and went on to state that

[h]is call center metrics will be monitored weekly during the month of

February. Should any deficiencies persist beyond the February training period, [Plaintiff] will be placed on probation, as discussed with [him] and Human Resources. . . . [Plaintiff] will be monitored heavily in March to ensure he is performing at the level of a tenured associate in a call center. If [Plaintiff] is placed on probation in March, he will be monitored daily. If no improvement is shown on a weekly basis, Human resources will be consulted for possible termination.

(Id.)  According to Plaintiff, this monitoring of his performance indicates that Defendants were singling him out on account of his age since "[y]ounger workers were not scrutinized in this way."  Again, however, Plaintiff has not provided any evidence indicating that younger workers were not scrutinized in a similar fashion.  In the absence of such evidence, Flores' Action Plan for Plaintiff raises no inference that Plaintiff's later termination was pretextual or motivated by age discrimination.  If anything, in light of a record demonstrating that Plaintiff's work performance had been less than adequate, it is quite understandable that MMLISI would want to scrutinize Plaintiff's work more closely than it had in the past to determine whether the extra training cured his performance deficiencies.

As to Plaintiff's assertion that there is no evidence that the March 16, 2009 call -- for which he received a low Quality score and was eventually terminated -- ever occurred, that has been specifically disproven by Defendants. The exhibit list of calls from March of 2009 submitted by them shows corresponding Quality scores, along with the names of the evaluator for each call.  (Exhibit M (attached to Defs' SOF).)  One of the five calls on the list is the March 16 call for which Plaintiff received the low Quality score of 1.27.  (Id.)  Granted, Plaintiff, retreating somewhat, argues that there should be a more comprehensive report and a recording of the call, both of which he alleges have been kept hidden from him.  As Defendants argue, however, Plaintiff himself has not

16

presented any evidence to cast doubt on the veracity of the score, much less to support

his claim that Defendants fabricated the incident.  As Plaintiff must recognize, he has

the burden of production at the third step of the *McDonnell Douglas* burden-shifting

framework, and simply asserting in his opposition that Defendants lack evidence of that

call -- when, in fact, they have provided such evidence -- does not suffice to carry that

burden.

Finally, Plaintiff's self-described "smoking gun" is an email from Kathleen Mayko,

a Human Resource consultant, to Flores on February 24, 2009.  (Exhibit A (attached to

Defs' SOF) at 196-199.)  In it, Mayko writes: "Hi Sergio, I am writing to follow-up on our

last conversation concerning Rich Fagan.  When we last spoke, Rich was scheduled for

training in early February.  Have you seen improvement since then?  Let me know your

thoughts.  I am more than happy to discuss next steps."  (Exhibit 21 (attached to Pl's

SOF).)  Plaintiff contends that this email shows that Flores had been planning to

concoct a plan to terminate him for ulterior motives.  This borders on the preposterous.

As Defendants argue, there is nothing whatsoever in this email to indicate the presence

of bias, ulterior motive, or anything other than a legitimate business communication

between Human Resources and a supervisor concerning the progress of an employee

with documented performance problems.

In sum, Plaintiff's claims of age discrimination hold no weight in terms of either

the federal or state standards.  Rather than demonstrating pretext, the evidence before

the court indicates that MMLISI was legitimately concerned about Plaintiff's

performance, took progressive steps to help him improve, and frequently warned him

that his failure to sufficiently improve could result in termination.  Plaintiff was flagged for

inadequate performance as early as December 4, 2007, received the worst possible rating on his 2007 year-end Performance Evaluation, received a Performance Warning on April 3, 2008, and failed to sufficiently improve his performance in 2008 and 2009 despite multiple individualized training sessions.  While Plaintiff spills much ink contesting the accuracy of his alleged poor performance and attempting to link various pieces of evidence to some overarching conspiracy against him, nothing he has submitted suffices to support the assertion of pretext.  Accordingly, the court will recommend that Defendants' motion for summary judgment as to Plaintiff's age discrimination claims be allowed.

B.  Retaliation Claims

While it is often difficult to cull Plaintiff's claims out of the morass of his complaint and memorandum, he appears to allege two separate sets of retaliation claims linked to both federal and state law, one in connection with his request for overtime and a salary increase, the other in connection with Mr. E.V.'s complaints.  Defendants, again, argue that the court should enter summary judgment in their favor because Plaintiff cannot meet his *prima facie* burden and, as well, because he was terminated for legitimate business reasons without any evidence of pretext.

1.  Pursuit of Overtime and Salary Increase

Defendants assert that Plaintiff, whether under federal or state law, cannot make out a *prima facie* case of retaliation for his pursuit of overtime pay and a salary increase related to his Series 7 certification.  More specifically, Defendants argue that Plaintiff was not engaged in "protected conduct" and, even if he had been, there is no causal connection between that conduct and his termination.  For the reasons which follow,

Defendants' alternative argument holds sway.

The Fair Labor Standards Act ("FLSA") makes it "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such an employee has filed any complaint" related to the FLSA.  29 U.S.C. § 215(a)(3).  The state analogue, M.G.L. c. 151, § 19(1), prohibits an employer from "discriminat[ing] against any employee . . . because such employee has complained of a violation of the provisions of [M.G.L. c. 151] . . . or because such employer believes that said employee or individual may complain of a violation of" M.G.L. c. 151.  As there is no direct evidence of retaliation in the case at bar, the familiar *McDonnell Douglas* burden-shifting framework, in the court's view, applies here as well.

To be sure, the court could find no First Circuit case directly holding that the *McDonnell Douglas* framework applies to FLSA retaliation claims.  The First Circuit, however, does "regard Title VII, ADEA, ERISA, and FLSA as standing *in pari passu* and endorse[s] the practice of treating judicial precedents interpreting one such statute as instructive in decisions involving another."  *Serapion v. Martinez*, 119 F.3d 982, 985 (1st Cir. 1997); *see also Cook v. CTC Communications Corp.*, 2007 WL 3284337, at *5 n.3 (D.N.H. Oct. 30, 2007) (collecting cases in which "courts have used the *McDonnell Douglas* framework in deciding retaliation claims under FLSA").  Similarly, because there is a dearth a case law interpreting M.G.L. c. 151, § 19(1), the court will also apply the *McDonnell Douglas* framework, as well as FLSA precedent, to Plaintiff's state law retaliation claim.  *See, e.g., Mole v. University of Massachusetts*, 442 F.2d 329, 338 (Mass. 2004) (applying *McDonnell Douglas* framework to retaliation claim under M.G.L. c. 151B, § 4(4)); *Commonwealth v. Colon*, 958 N.E.2d 56, 62 (Mass.App.Ct. 2011)

("When a Massachusetts statute "tracks [a] Federal statue, we have looked to the Federal case law for guidance in interpreting our cognate statute." (internal quotation marks omitted)).

At the first step of this framework, Plaintiff must establish a *prima facie* case by showing that (1) he engaged in protected conduct, (2) his employer thereafter subjected him to an adverse employment action, and (3) there is a causal connection between the protected conduct and the adverse action. *See Blackie v. State of Maine*, 75 F.3d 716, 722-23 (1st Cir. 1996). For the reasons which follow, Plaintiff has failed in this endeavor.

Defendants first argue that Plaintiff's request for unpaid overtime and a salary increase did not amount to "protected conduct" because he did not file any claims until after he was terminated. In *Valerio v. Putnam Associates Inc.*, 173 F.3d 35, 41-44 (1st Cir. 1999), however, the First Circuit held that an employee need not file a judicial or administrative complaint to be protected by the FLSA's anti-retaliation provision. Rather, internal "complaints" to an employer are sufficient under certain circumstances. *See id.* (holding that "the FLSA's anti-retaliation provision will protect an employee who has filed a sufficient complaint with an employer" but stating that "not all abstract grumblings will suffice to constitute the filing of a complaint" and that courts should "proceed on a case-by-case basis, addressing as a matter of factual analysis whether the internal communications to the employer were sufficient to amount to the 'filing of any complaint' within the statutory definition"). Moreover, the Supreme Court in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1335 (2011), held that an employee need not even submit a written complaint to his or her employer; oral

complaints will do as long as they are sufficiently clear to give the employer "fair notice

that a grievance has been lodged."  *See also Claudio-Gotay v. Becton Dickinson*

*Caribe, LTD*, 375 F.3d 99, 102 (1st Cir. 2004) ("To engage in protected activity, the

employee must step outside his or role of representing the company and . . . file . . . an

action adverse to the employer, actively assist other employees in asserting FLSA

rights, or otherwise engage in activities that reasonably could be perceived as directed

towards the assertion of rights protected by the FLSA." (internal quotation marks

omitted)).

Although the exact manner in which Plaintiff brought the issue to the attention of

Flores is unclear, it is undisputed that he at least inquired about the salary increase and

unpaid overtime in February of 2009.  Of course, both the FLSA and Massachusetts law

require employers to provide overtime compensation for certain employees who work

more than forty hours in a week.  *See* 29 U.S.C. § 207(a)(1); M.G.L. c. 151, § 1A.

Therefore, depending on the manner of his inquiry, Plaintiff's communications certainly

could rise to the level of "filing a complaint" under 29 U.S.C. § 215(a)(3), and hence

constitute "protected conduct," so as to satisfy the first prong of his *prima facie* burden.[2]

Looking at the facts in a light most favorable to Plaintiff and considering his *pro se*

status, the court will assume that he has, indeed, satisfied this requirement.

At the second prong of the *prima facie* showing, it is undisputed that MMLISI

subjected Plaintiff to an adverse employment action, namely, his termination.  Plaintiff

---

[2] Because entitlement to overtime compensation is a right protected by both the
FLSA and Massachusetts law, the court need not address whether Plaintiff's inquiry into
a salary increase for obtaining his Series 7 certification also constitutes "protected
conduct."

also appears to assert that his Performance Probation was an adverse employment action; that action, which took place on March 2, 2009, also occurred after his February inquiry into overtime pay.  Since Defendants, for present purposes, have not argued otherwise, the court will assume that Plaintiff has satisfied the second prong of his *prima facie* burden with regard to both employment actions.

Plaintiff's claims of retaliation, however, collapse at the third prong of the analysis, namely, the "causal connection" between the protected conduct and the adverse employment actions.  At best, Plaintiff relies exclusively on the temporal proximity of the "protected conduct" and the adverse actions, as there is no other evidence which connects his request for unpaid overtime to those actions.  In fact, at first glance, the close proximity between Plaintiff's request and the adverse actions might appear sufficient to establish a causal connection; Flores placed Plaintiff on probation only weeks after his inquiry, and Plaintiff was terminated approximately three weeks after that.  Unfortunately for Plaintiff's cause, however, the performance issues which led to his termination were in place long before his overtime inquiry.  In the court's view, even looking at the facts in a light most favorable to Plaintiff, the temporal proximity was merely coincidental.

In *Mole v. University of Mass.*, 814 N.E.2d 329, 332-33 (Mass. 2004), the Supreme Judicial Court ("SJC") -- in the context of retaliation claims under M.G.L. c. 151B, §§ 4(4) and 4(4A), and Title VII -- similarly held that the plaintiff failed to introduce sufficient evidence of a causal connection.  The plaintiff there worked, along with his wife, at the University of Massachusetts Medical Center ("UMMC"), and his protected conduct was his support of his wife's sexual harassment claim against one of their

22

supervisors. *Id.* at 333-34.  As in the instant case, the plaintiff argued that the temporal proximity between the protected conduct and the adverse actions raised a sufficient inference of a causal link. *Id.* at 339.  The SJC explained, however, that the plaintiff's "problems at UMMC began prior to [his wife's] lodging of any charge." *Id.*  "Where, as here," the SJC continued, "adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation." *Id.* (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam); *Hoeppner v. Crotched Mountain Rehabilitation Ctr.*, 31 F.3d 9, 12, 14-16 (1st Cir. 1994)).  The SJC further explained that the first adverse action taken after the plaintiff's supervisors learned of the sexual harassment charge, an annual evaluation of the plaintiff, was "merely a continuation of a theme that had already been announced in his prior year's evaluation . . . .  In short, there is nothing adverse in that evaluation that was not already presaged by events occurring prior to [his supervisors'] awareness of [the plaintiff's] involvement in protected activity." *Id.* at 342.

The SJC's analysis is both applicable and persuasive here.  There is no evidence that Plaintiff ever inquired about the unpaid overtime until sometime in February of 2009.  While Plaintiff did suffer from adverse employment actions shortly after that inquiry, those adverse actions, just as in *Mole*, were "merely a continuation of a theme" already underway prior to the protected conduct. *Id.*  In fact, the February trainings that precipitated Plaintiff's Performance Probation on March 2, 2009 had already been scheduled as of January of 2009.  Those trainings were scheduled because Plaintiff had

not sufficiently improved his performance in 2008 following his inadequate performance
in 2007.  Most notably, by the end of 2008, Plaintiff still had not transitioned to the
computerized note-taking system -- an issue that had been noted as early as Plaintiff's
2007 year-end Performance Evaluation.  Accordingly, both the Performance Probation,
which was instituted because Plaintiff failed to sufficiently improve following the
February trainings, and the termination, which occurred because he received a Quality
score of 1.27 on a call he failed to "track," were "already presaged by events occurring
prior to" Flores' awareness of Plaintiff's protected conduct.  *Id.*  There being nothing
more than a temporal link, the court has little choice but to conclude that Plaintiff's
inquiry into unpaid overtime had nothing to do with the subsequent actions taken by
Defendants.  *See Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
425 F.3d 67, 85 (1st Cir. 2005) ("[C]hronological proximity does not by itself establish
causality, particularly if '[t]he larger picture undercuts any claim of causation.'") (quoting
*Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003)).[3]

    2.  Retaliation Related to Mr. E.V.

    The legal basis for Plaintiff's claim of retaliation claim with regard to Mr. E.V is
not entirely clear.  As best the court can determine, Plaintiff may be asserting a common
law claim for retaliation in violation of public policy.  *See Flesner v. Technical*

---

[3] Even if Plaintiff could somehow make out a *prima facie* case of retaliation, the
court would still recommend that summary judgment be entered in favor of Defendants
because Plaintiff has failed to demonstrate, at the third step of *McDonnell Douglas*
framework, that Defendants' articulated reasons for the adverse actions were
pretextual.  Just as he failed to do with his age discrimination claims, Plaintiff has not
brought forward any evidence to indicate that Defendants did not believe that his
performance was inadequate or that the real reasons for the adverse actions were
retaliatory.

*Communications Corp.*, 575 N.E.2d 1107, 1111 (Mass. 1991) (holding that "legal redress [is available] in certain circumstances for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed," such as "[c]ooperating with an ongoing governmental investigation").  It is unlikely, however, that such a claim is available under these facts. Yet even if it were, the court concludes that summary judgment in Defendants' favor is appropriate for the same reason as it is for Plaintiff's retaliation claim for unpaid wages, namely, the lack of a causal connection between the protected conduct and the adverse actions.  *See Pader v. Leading Edge Products, Inc.*, 659 N.E.2d 756, 759 (Mass.App.Ct. 1996) ("The plaintiff has not specified which of the categories of public policy violation her situation falls into. . . .  Nevertheless, assuming she could not be fired for reporting the incident to the police, it is not enough for her to assert that she was fired for that reason.  She was required to produce evidence sufficient to meet her burden of proving a causal relationship between the two events.").

As described, Plaintiff received the call from Mr. E.V. on or around October 29, 2008.  Prior to this call, however, Plaintiff had already received (a) an email from Tobin on December 4, 2007, explaining that his performance was lacking in several areas, (b) his 2007 year-end Performance Evaluation scoring him as "Needs Improvement," and (c) a Performance Warning on April 3, 2008.  Following his October 29 and 30, 2008 emails about Mr. E.V.'s call, Plaintiff did not hear again about Mr. E.V. until March 20, 2009, when Jimmy Warren, of the Compliance Department, informed him that Mr. E.V. had praised Plaintiff for his help.  In response, Plaintiff told Warren to "tell my boss."  By that time, however, Plaintiff had already received a Quality score of 1.27 on another call,

a clear violation of his Performance Probation.  In addition, Flores, Szmyt, and Brandy

Alexander, one of the Directors of MMLISI, each denied any knowledge of Mr. E.V.

when asked by Plaintiff.  (Exhibit 1 (attached to Defs' Reply) at 63-64; Exhibit 3 at 15,

24; Exhibit 4 at 28.)  Again, the court has little choice but to conclude that Plaintiff has

not established a causal connection between any protected conduct related to Mr. E.V.,

if protected it was, and the adverse employment actions.  Accordingly, it will recommend

that Defendants' motion for summary judgment as to Plaintiff's retaliation claims be

allowed.

C.  Defamation

Plaintiff appears to allege in his complaint, as supplemented by his

memorandum, that Tobin's comments in the December 4, 2007 email, his 2007 year-

end Performance Evaluation, and his April 3, 2008 Performance Warning constitute

defamation.  In their motion for summary judgment, Defendants argue that Plaintiff

cannot succeed on his defamation claims because the statements about which he

complains are conditionally privileged.  Defendants' argument is persuasive.

"The test whether a publication is defamatory is whether, in the circumstances,

the writing discredits the plaintiff 'in the minds of any considerable and respectable

segment in the community.'"  *Draghetti v. Chmielewski*, 626 N.E.2d 862, 866 (Mass.

1994) (quoting *Tropeano v. Atlantic Monthly Co.*, 400 N.E.2d 847, 851 (Mass. 1980)).

As Defendants point out, however, "[a]n employer has a conditional privilege to disclose

defamatory information concerning an employee when the publication is reasonably

necessary to serve the employer's legitimate interest in the fitness of an employee to

perform his or her job."  *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 79 (Mass. 1987)

(internal quotation marks omitted).  Since all of the statements at issue concern

Plaintiff's job performance, even if otherwise considered defamatory, this conditional

privilege clearly applies here.  Of course, "[t]he conditional privilege is lost if the

defendant (1) knew the information was false, (2) had no reason to believe it to be true,

or (3) recklessly published the information unnecessarily, unreasonably, or excessively."

*Sklar v. Beth Israel Deaconess Medical Center*, 797 N.E.2d 381, 388 (Mass.App.Ct.

2003); *see also Foley*, 508 N.E.2d at 79 (employee has the burden of proving that the

conditional privilege is lost).  Plaintiff has not offered any evidence which demonstrates

the applicability of any one of these exceptions.  Accordingly, the court will recommend

that Defendants' motion for summary judgment as to Plaintiff's defamation claims be

allowed.

D.  Violation of Covenant of Good Faith and Fair Dealing

The court also agrees with Defendants that Plaintiff cannot succeed on his claim

for a violation of the covenant of good faith and fair dealing.  Under Massachusetts law,

there is a narrow exception to the general rule that an at-will employee may be

terminated at any time and for any reason or no reason at all for

> cases in which an ousted employee can show that the termination of his
> employment deprived him of compensation clearly connected to work already
> performed (and, thus, unjustly enriched the employer). . . .  The rationale
> behind this exception is that every contract contains a covenant of good faith
> and fair dealing, and en employer breaches that covenant when it dismisses
> an at-will employee in order to deprive him of compensation fairly earned and
> legitimately expected for services already rendered.

*Cochran v. Quest Software, Inc.*, 328 F.3d 1, 8 (1st Cir. 2003) (internal citations

omitted).  To prevail on such a claim, "a plaintiff must demonstrate that the employer

terminated the plaintiff for the purposes of 'depriving the employee of money that he

fairly earned and legitimately expected.'" *Sands v. Ridefilm Corp.*, 212 F.3d 657, 662-63 (1st Cir. 2000) (quoting *King v. Driscoll*, 673 N.E.2d 859, 862 (Mass. 1996)).

Not only has Plaintiff failed to present evidence demonstrating that MMLISI terminated him for anything other than legitimate performance issues, but he has not presented any evidence indicating that he was deprived of any earned compensation. After Plaintiff brought his unpaid overtime and salary concerns to Flores' attention, Flores, as described, investigated the issue thoroughly and ultimately obtained approval for the unpaid compensation. While Plaintiff received the payment in his final paycheck, the decision, for administrative reasons, to disburse the money on that date had already been made prior to the March 16 call for which he was terminated. Accordingly, Plaintiff cannot demonstrate that MMLISI terminated him for the purpose of depriving him of that compensation. As such, the court will recommend that summary judgment on Plaintiff's claim of violation of the covenant of good faith and fair dealing be granted.

E.  Remaining Claims

Based on his opposition, Plaintiff also appears to be pursuing claims for hostile work environment, conspiracy and, perhaps, "negligent supervision" and/or "negligent management." These claims have not been developed and are too tenuous to survive; Plaintiff simply lists them at the end of both his complaint and his opposition.

Although Defendants have only explicitly addressed the claims previously discussed, they have indicated that they are seeking summary judgment on *all* of Plaintiff's claims, which would include these. They also argue, accurately in the court's view, that due to the confusing and duplicative nature of Plaintiff's complaint, it is virtually impossible to determine exactly what legal causes of action he is advancing in

this case and, as a result, they were forced to address in detail only the allegations that appear to be the gravamen of his various claims, based principally on his deposition testimony.

While Defendants perhaps could have done something more, the court concludes that, because of the difficulty with which it was able to even identify these additional claims and the utter lack of factual or legal support for them, Plaintiff should not reap the benefit of his scatter-shot approach.  *See Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009) (district court's entry of summary judgment was not improper, even though the defendant "did not develop an argument on the substance of" certain claims, because the defendant sought summary judgment on *all* claims and the remaining claims were clearly meritless).  In particular, as to the hostile work environment claim, there is nothing in the record to indicate that Plaintiff was subjected to "a work environment pervaded by harassment or abuse that unreasonably interfered with his work performance, and that such conduct was sufficiently severe and pervasive to interfere with a reasonable person's work performance."  *Windross v. Village Automotive Group, Inc.*, 887 N.E.2d 303, 310 (Mass.App.Ct. 2008) (providing examples of conduct rising to the level of a hostile work environment).  As for the "negligent supervision" and "negligent management" claims, the court cannot determine Plaintiff's basis for liability under these theories; moreover, there is nothing in the record, nor even the complaint, which indicates any actionable negligent conduct on the part of Defendants.  Finally, because Plaintiff, in the court's view, cannot succeed on any of his underlying claims, his conspiracy claims also fail.  *See Bartle v. Berry*, 953 N.E.2d 243, 253 (Mass.App.Ct. 2011) ("To prove their claims for civil conspiracy, the

plaintiffs must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement.").


    Accordingly, the court recommends that summary judgment be entered in Defendants' favor on Plaintiff's hostile work environment, conspiracy, "negligent supervision," and "negligent management" claims.

IV. CONCLUSION

    For the reasons described, the court recommends that Defendants' motion for summary judgment be ALLOWED.[4]

IT IS SO ORDERED.

DATED:   May 24, 2013

                              /s/   Kenneth P. Neiman
                              KENNETH P. NEIMAN
                              U.S. Magistrate Judge

---

[4] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.